## Williams et al. v. Word's Adm'x.

June 5, 1942.

S. S. Willis and Lindsay D. Bruce for appellants.

John F. Coldiron for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming in part and reversing in part.

This appeal is from a judgment setting aside three deeds by which the appellant, Gertrude Williams, conveyed to her sister, the appellant, Sadie Williams, certain real estate and ordering it sold to satisfy a judgment against Gertrude amounting to approximately $1,800.

The judgment was obtained by appellee in 1939 in

an action filed in the year 1938, while the deeds set aside by the judgment were executed in 1936 and recorded in 1937. The judgment was for the balance due on a note dated July 9, 1937, but the note was executed for an indebtedness which was in existence for some years prior to the execution of the deeds. In the action in which the judgment was obtained Gertrude set up as a defense an alleged side contract, executed at the same time as the note, pursuant to which she claimed to be entitled to certain credits on the note. On an issue submitted to the jury this side contract was, in effect, found to be a forgery. In the present action this side contract was again pleaded as a defense but the chancellor correctly sustained a plea of res judicata as to this.

The deeds set aside by the judgment conveyed lots 23 and 24 on Bellefont Street in Russell and lots 5 and 66 in Raceland. Lots 23 and 24 were under mortgage to a building and loan association in Louisville to the extent of $13,500. The other lots were under mortgage to a Mrs. Fullerton for $2,500.

It was alleged that the deeds were executed without any valuable consideration and with the fraudulent intent to cheat, hinder and delay the creditors of Gertrude Williams and that they were therefore void under Sections 1906 and 1907 of the Kentucky Statutes. Appellants denied the fraud and pleaded a valuable consideration. It was pleaded that on July 9, 1933, a contract of sale was entered into between appellants as follows:

"This agreement made by Gertrude Williams of Keith, W. Va., and Sadie Williams of Russell, Ky., Gertrude agrees to sell Sadie lot 23 and 24 on Bellfont St. for $2000 and she take care of the debts— and also lot 66 and 5 in Raceland for $1500 and she take care of the debts. Payments to be made to suit both parties."

It was then alleged that the consideration called for by this contract was paid and that the deeds were executed pursuant to the contract.

Appellants both testified as to the execution of the contract of sale, which was written in a little red book belonging to Gertrude, formerly a bank pass book. They both testified also that the consideration called for in the contract was paid. Each appellant says she kept a record of the dates and amounts of the payments, ten in all,

that by Gertrude being kept in the little red book while that of Sadie was kept on a sheet of paper torn from a ledger. Introduced in evidence also were receipts signed by Gertrude for each of the payments, corresponding with the entries in the red book and with the record testified to by Sadie except in one particular hereafter noted.

It may here be remarked that from the date of the alleged contract of sale Gertrude continued in active management and control of the property conveyed—true, she was in West Virginia a good part of the time from 1933 to 1937, but, nevertheless, she seems to have been in active charge of the property. She always paid the taxes, though both claim that Sadie furnished the money for this purpose. There was no change in the assessment of the property to Sadie's name. After the execution of the alleged contract of sale, Gertrude made application in her name and secured a loan from the building and loan association in Louisville to pay off existing mortgages on lots 23 and 24. This is explained by appellants by the fact that Gertrude had stock in the building and loan association and was the only one who could get the loan. In testifying about this matter Gertrude said: "She was to take the property over if I could arrange a loan." This, in face of the fact that at that time Sadie had ostensibly become the owner of the property by the alleged contract of sale.

Again, in paying off the mortgage indebtedness to Mrs. Fullerton on lots 5 and 66, money was borrowed from a bank on Gertrude's note with Sadie and a brother as surety. This money was deposited to Gertrude's credit and check given by her on this deposit to Mrs. Fullerton. These and other instances of control over the property by Gertrude are accounted for by appellants on the theory that Gertrude was acting as agent for Sadie under an arrangement for Gertrude to manage this and other property of Sadie for an agreed compensation, consisting of board and a certain commission.

The chancellor found, correctly we think, that the following badges of fraud were connected with the transaction: 1) Confidential relationship between the grantor and grantee, who were sisters living together, 2) insolvency or considerable indebtedness of Gertrude at the time of the conveyances, 3) failure to record the conveyances for a considerable period of time, 4) continued control and management of the property after the execution

of the deeds. He further found that such badges of fraud were not satisfactorily explained but that on the contrary the record of payments for the property kept by appellants, as well as the receipts given for these payments were spurious. Since our consideration of the case serves merely to leave our minds in doubt as to the correctness of the chancellor's judgment, thus making it our duty to affirm it, and since the chancellor aptly expressed his findings on this point and his reasons therefor, we have concluded to adopt a portion of his opinion as follows:

"The record shows that in 1933, when the alleged contract of sale was supposed to have been signed, Gertrude Williams was in debt. All these pieces of property were under mortgage. At that time she was engaged in the coal business in West Virginia with one M. J. Mantz. The court knows that this was a very hazardous business, particularly at that time, and the fact that it was hazardous is proven by Gertrude's failure in it. The question was put to each of the defendants as to the *purpose* of Gertrude's selling all of her property to Sadie for the consideration which they allege. They each answered that the purpose of making the contract was to furnish Gertrude with ready money to put into her coal business. She was unable to raise money on a second mortgage on her property. If that was the dominant purpose of the contract and sale, it seems a little strange to the court that there was no cash payment made by Sadie to Gertrude at the time. The alleged payments which were made on the contract were strung out from 1933 to 1936. In the contract referring to the time and manner of payment of the purchase price we find these words: 'payment to be made to suit both parties.' There is nothing there which obligated Sadie to furnish any immediate money and the fact that the payments were strung out from 1933 to 1936 is rather convincing evidence with the court that the parties did not have in mind any such purpose as selling the property for immediate cash to invest in the coal business in West Virginia. It follows that if they were untruthful about the purpose of this contract, their good faith in the entire transaction is open to considerable doubt. The court has reached the conclusion that it was not the real purpose of these parties

in entering into this contract to furnish Gertrude with immediate capital, but that the real purpose was something else.

"The defendants in support of their claim of good faith introduced in evidence three records as follows: (1) The alleged written contract of July 29, 1933, recorded in a little red book, together with entries of the time and amounts of payments made by Sadie to Gertrude on the purchase price. Recorded in the little red book on the opposite page from the contract, all of which are in the handwriting of Gertrude Williams are the time and amounts of payments; (2) Ledger sheet made out in the handwriting of Sadie Williams purporting to record the time and amount of payments made by Sadie to Gertrude on the contract; and, (3) Various receipts purporting to have been given by Gertrude to Sadie for the respective payments.

"A careful examination of the record of payments as kept by Gertrude from August 1933 to January 1936, leads the court to believe that all the entries made therein were made with the same pencil and they seem to be about the same age. The same observations may be made as respects the ledger sheet kept by Sadie. The court has carefully examined the record of payments introduced by Gertrude with that kept by Sadie and finds from that examination two strange things. These two defendants were keeping separate records and they each testified positively that they made these various entries on their respective sheets as the payments were made. The court records two entries of payments made by Gertrude Williams exactly as they appear on her little red book as follows:

| May 1 | 34 | $100 |
| Aug 1 | 34 | 400 |

"Now let us turn to the record introduced by Sadie as respects these same payments and shown in her hand writing as follows:

| May | 34 | 100 |
| Aug | 34 | 400 |

"In all the other entries on each of these records the year is completely written out in figures

as: 1933, 1934, 1935, 1936. It is a strange co-incidence indeed that in the May and August payments in the year *1934*, they are recorded in each of these records simply as '34.' To the court there appears to be only one explanation to this extreme co-incidence and that is, that one of them was copied from the other, thus, destroying their testimony that they each separately recorded these payments at the time and in the manner claimed by them. Such a co-incidence as this would not happen once in a thousand times and is extremely unlikely.

''The court finds another very suspicious entry of a payment recorded on the Sadie Williams record under date of 'Oct. *1936*—300'. The supposed corresponding entry on the Oct. 1936 payment made by Gertrude in her little red book is 'Oct. 1, 1, 1935.' Thus, it appears that Gertrude records that payment as of 'Oct. *1935*' and Sadie records it as of 'Oct. *1936*'. They both testified that the correct date of making that payment was October 1935. Then the question naturally arises whether Sadie actually recorded these alleged payments as made and if this payment was made in October 1935, as they say, why it is that in her record sheet she records it as '1936'?

''The court has found from long experience, and it is a matter of common knowledge, that if a transaction is recorded in a given year that it is extremely unlikely that in making that record the party making it will reach over into the following year which had not as yet arrived. If I make a record of something happening in October. *1940*, it would be extremely unlikely that I would write down *1941*. Experience teaches that when we turn to a new year we have trouble breaking ourselves of the habit of recording the old year instead of the new. The alleged mistake on the part of Sadie is just the reverse of custom and habit.

''These discrepancies in these documents leave the court in great doubt about the truth of the statements of the defendants that Sadie made these payments at the time and in the manner testified to by them and as shown by the records. The court is led to believe that they were each written simultaneously and one of them was copied from the other.

"The defendants have filed as evidence in this case a series of receipts for payments made by Sadie to Gertrude and which would operate as a connecting link between the record kept by Gertrude and that kept by Sadie. The fact that the sheets kept by Gertrude and Sadie are open to suspicion, lends color to suspicion about these receipts. The court has carefully scrutinized each and all of these receipts and while the court is not an expert in handwriting, the writing on all these receipts which is that of Gertrude Williams very strongly indicates to the court that they were each and all written with the same pencil and they appear to be of approximately the same age. Then, too, the studied carelessness of the bits of paper on which they were written is not without it's significance. It rather points to a job well done, but in doing it, the mechanics of it show its own weakness."

In view of our approval of these findings it is obvious that there is a complete collapse of appellants' entire case. We may add that the testimony of appellants contains numerous contradictions, inconsistencies and incongruities lending support to the chancellor's finding but it would draw this already long opinion out to undue length and serve no useful purpose to recite them.

It is insisted by appellants that since they pleaded the 1933 contract of sale pursuant to which the deeds were executed and no attack was made on the contract, the deeds could not be set aside. Cited in support of this contention are Daugherty et al. v. Northern Coal and Coke Company, 174 Ky. 423, 192 S. W. 501, and Smith v. Graf, 259 Ky. 456, 82 S. W. (2d) 461. In each of those cases, however, the action was filed by the grantor in a deed executed pursuant to a previous valid contract to convey. It was held that since the deed attacked was but a compliance with a contract not attacked and which a court would enforce in a suit for specific performance, it would be an empty gesture to set aside the deed. In the present case, however, the action is by a creditor and the finding of the chancellor was that the contract and deeds were linked together as a part of a plan to defeat the enforcement of appellee's judgment—the contract being subject to the same vice as the deeds goes down with them.

Finally, it is argued that the judgment should be re-

versed because the evidence disclosed that there were certain liens on the property and the lien holders were not made parties. Section 694 of the Civil Code of Practice requires all lien holders to be made defendants and prohibits the court from ordering a sale which may be prejudicial to their rights. When it developed that there were outstanding liens on the property, the court should have required these lien holders to be made parties before ordering a sale in order that their rights might be protected and the judgment was erroneous to the extent that it ignored their rights. However, the error in this particular has no effect on the main branch of the case dealing with the deeds, which is the only question raised on the appeal in which the appellants have a real and vital interest. Accordingly, the judgment is affirmed except as to that portion adjudging a sale of the property, and in this particular it is reversed with directions to set it aside for the purpose of making the lien holders parties and for further consistent proceedings. However, since appellants did not raise this question below and afford the chancellor an opportunity to consider it and avoid this error by requiring the lien holders to be made parties, and since the judgment is affirmed as to the only phase of the case in which appellants are really interested, the costs of the appeal will be taxed against them.

The judgment is affirmed in part and reversed in part as indicated.